### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF VIRGINIA
### Richmond Division

In re: Meridien Energy, LLC,           Case No. 23-31377-KLP
           Debtor.            Chapter 11

### MEMORANDUM OPINION

On August 23, 2023, the Court conducted an evidentiary hearing in connection with the motion filed July 29, 2023, by Meridien Energy, LLC (the "Debtor") seeking approval, pursuant to Bankruptcy Rule 9019,[1] of a proposed settlement and compromise (the "9019 Motion"). [ECF No. 204].[2] On August 16, 2023, MarkWest Liberty Midstream and Resources, L.L.C. ("MarkWest"), an unsecured creditor, filed its opposition to the 9019 Motion. [ECF No. 230]. After hearing and considering the evidence and argument of counsel, the Court announced its intention to enter an order approving the 9019 Motion and overruling the objection of MarkWest. On August 28, 2023, the Court entered an order approving the 9019 Motion (the "9019 Order"). [ECF No. 253]. The following memorandum is issued in support of the 9019 Order.

### Background and Findings of Fact

The Debtor initiated this Chapter 11 case by filing a voluntary petition on April 20, 2023. The Debtor is a Virginia limited liability company operating a full-service pipeline construction business headquartered in Randolph, New York, and has engaged in extensive gas pipeline construction projects, primarily in the eastern

---

[1] Fed. R. Bankr. P. 9019. All references to the Bankruptcy Rules are to the Federal Rules of Bankruptcy Procedure, Fed. R. Bankr. P.

[2] All references to ECF are to the Court's electronic case file in this case.

United States.  The Debtor has continued to operate its business and manage its affairs as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.[3]

The Debtor employs approximately sixteen individuals on a full-time basis, with twelve employees being paid on an hourly basis and four employees receiving a salary.  [Declaration of John W. Teitz in Support of the Debtor's Voluntary Petition and First Day Motions or "Teitz Dec.," ECF No. 7, at 1].  The Chief Executive Officer and sole member of the Debtor is William C. Schettine ("WCS") [ECF No. 104, at 10]. The four salaried employees are WCS and members of his family, Heather, James and Angela Schettine, who are listed as insiders and officers of the Debtor.  [Statement of Financial Affairs at 10-11, ECF No. 104].  John Rose ("Rose") is listed in the Statement of Financial Affairs as the Debtor's Independent Director. [*Id.*].

On April 27, 2023, the Court entered an order designating John W. Teitz ("Teitz") to perform the duties imposed upon the debtor by the Bankruptcy Code. [ECF No. 35].  Teitz, a managing director of Compass Advisory Partners, LLC, was retained as the Chief Restructuring Officer of the Debtor for the purpose of managing the Debtor's day-to-day operations while assisting in the Debtor's restructuring efforts.  [Teitz Dec. at 1].[4]

---

[3] All references to the Bankruptcy Code are to 11 U.S.C. §§ 101-1532.
[4] At the time of the August 23, 2023, hearing, Teitz was no longer employed by the Debtor. [Trial Tr. at 80-81, ECF No. 308].  All references to the trial transcript will be to the transcript filed at ECF No. 308, unless otherwise noted.

The Debtor's bankruptcy filing followed a lengthy and heavily litigated dispute with MarkWest. On November 16, 2018, MarkWest commenced a lawsuit against the Debtor in the District Court for the City and County of Denver, Colorado (the "Colorado Court") in connection with a project to construct a natural gas pipeline in West Virginia (the "Project"). [Teitz Dec. at 5]. MarkWest had contracted with the Debtor to construct certain segments of the Project and asserted that the Debtor had breached its obligations under the contract. In response, the Debtor asserted various counterclaims against MarkWest. A trial took place in the Colorado Court in October 2021, resulting in a net judgment in favor of MarkWest in the amount of $13,283,384.64 (the "Judgment"). Both parties appealed elements of the Judgment and the award of damages to the other party, which appeals remain pending in the Colorado Court of Appeals. [Teitz Dec. at 6].

The Debtor cited the costs and burdens associated with termination of the Project and the resulting litigation, along with additional financial setbacks stemming from the COVID-19 pandemic, as the reasons for its Chapter 11 filing. At the time of its filing, the Debtor listed approximately $19.5 million in total debt obligations. Approximately $5.2 million of that debt is secured by substantially all the Debtor's assets, with Bank7 Corporation ("Bank7") holding approximately $4 million of the secured indebtedness. [Teitz Dec. at 7].

The Debtor is also indebted to WCS in the approximate amount of $1,160,000 under a line of credit dated March 30, 2023. The WCS indebtedness is secured by a second priority lien behind Bank 7 in substantially all the Debtor's assets. [Teitz

Dec. at 8]. At the time of its filing, the Debtor had unsecured debts totaling approximately $14.3 million, inclusive of the disputed MarkWest claim. [Teitz Dec. at 9].

On May 4, 2023, the Office of the United States Trustee filed a statement indicating that no unsecured creditors committee had been formed in the case. [ECF No. 46]. Although its claim is disputed by the Debtor, MarkWest is, by far, the Debtor's largest unsecured creditor.

Immediately after its bankruptcy filing, the Debtor filed a motion (the "DIP Financing Motion") seeking approval of interim postpetition financing (also referred to as the "DIP Financing") from ICT-DIP, LLC (the "DIP Lender") in the amount of $1.6 million, for the purpose of "preserving and maximizing" the value of its estate. [ECF No. 6]. The DIP Lender is a Kansas limited liability company owned and operated by Max Nicols, an industry insider who became acquainted with WCS through the American Pipeline Contractors Association. [Teitz Dec. at 21-22]. WCS agreed to subordinate his second lien position in the Debtor's assets to the superpriority administrative claim and liens of the DIP Lender. [*Id.*]. On April 25, 2023, the Court held first day hearings in the case, after which the Court approved the DIP Financing Motion on an interim basis, over the objection of MarkWest. The order authorizing the Debtor to obtain interim DIP Financing was entered on April 27, 2023. [ECF No. 34].

On May 16, 2023, MarkWest filed an objection to the Debtor's request for final approval of the DIP Financing. [ECF No. 60]. MarkWest complemented its

objection on June 1, 2023, by filing its "Rule 60 Motion for Relief from the Interim Order approving the DIP Financing." [ECF No. 88]. On the same date, MarkWest filed a motion seeking derivative standing to investigate and pursue potential avoidance actions against the Debtor's prepetition secured lenders "to avoid Bank7's and Mr. Schettine's unperfected liens pursuant to section 545 of the Bankruptcy Code . . . ." [ECF No. 89 at 2]. On June 7, 2023, MarkWest filed a motion to appoint a chapter 11 trustee. [ECF No. 121].

On June 7, 2023, the Court held a lengthy evidentiary hearing on the Debtor's request for final approval of the DIP Financing Motion. At the conclusion of the hearing, the Court overruled the objection of MarkWest and granted final approval of the DIP Financing Motion. On June 8, the Court entered a final order authorizing the Debtor to obtain postpetition financing. [ECF No.132].[5] Neither of the orders approving DIP Financing were appealed, and the time to file an interim appeal has expired.

On June 6, 2023, the Debtor filed a stipulation addressing liens on certain motor vehicles and trailers (the "Stipulation"). [ECF No. 117]. The Stipulation, between the Debtor, Bank7 and WCS, provides that Bank7 and WCS's asserted liens on 48 motor vehicles and 30 trailers are avoided pursuant to § 544 of the Bankruptcy Code and preserved for the Debtor's estate pursuant to § 550. MarkWest's derivative standing motion had been filed, at least in part, on the

---

[5] MarkWest's "Rule 60 Motion for Relief from the Interim Order approving the DIP Financing," [ECF No. 88], was rendered moot as a result of the Court's final approval of the DIP Financing.

assertion that the Debtor did not intend to pursue certain avoidance claims, including the liens successfully avoided by the Debtor under the Stipulation.

On July 26, 2023, MarkWest withdrew its motion for derivative standing. [ECF No. 200].  On August 18, MarkWest withdrew its motion to appoint a chapter 11 trustee.  [ECF No. 229].  The hearings on both motions were therefore canceled.

On August 23, 2023, the Debtor filed its Disclosure Statement and Chapter 11 Plan of Reorganization.  [ECF Nos. 245, 246].  On September 8, the Court entered an order granting conditional approval of the disclosure statement and scheduled a hearing to consider final approval of the Disclosure Statement and Plan Confirmation for October 25, 2023.  [ECF No. 290].

The 9019 Motion.  The 9019 Motion seeks entry of an order approving a settlement and compromise between the Debtor and WCS, Heather Schettine ("HS"), James Schettine ("JS"), Angela Schettine ("AS"), East Coast Transportation, Inc. ("ECT"), AJAR International, Inc. ("AJAR"), Meridien Media, LLC ("MM"), 2DP International, LLC ("2DP"), Meridien Holdings, LLC ("MH"), Meridien West, LLC ("MW"), Meridien Pipeline Services, LLC ("MPS"), and WB Pipeline, LLC ("WBP" and with WCS, HS, JS, AS, ECT, AJAR, MM, 2DP, MH, MW, MPS and their affiliates [if any], collectively, the "Potential Defendants").[6]  In the 9019 Motion, the Debtor alleges that (1) on April 26, 2023, its professionals notified counsel for the Potential Defendants that it would be investigating potential actions against them; (2) consistent with its fiduciary duties to the bankruptcy estate, the Debtor and its

---

[6] The entities included among the Potential Defendants are WCS or Schettine family related entities.  [Tr.at 92, ECF No. 304].

professionals completed a comprehensive review and analysis of the Debtor's transactional history and financial records to determine whether the Debtor possessed any claims, including those arising under Chapter 5 of the Bankruptcy Code, that the Debtor could monetize to maximize the value of its estate; (3) the Debtor identified certain transfers of assets of the Debtor's estate for the benefit of the Potential Defendants within five years preceding the bankruptcy filing (collectively, the "Subject Transfers"); and (4) after conducting a forensic analysis of the Subject Transfers, the Debtor, on July 19, 2023, issued a demand letter identifying possible claims and demanding payment from the Potential Defendants, jointly and severally.  [ECF No. 204, at 3-4].  In the 9019 Motion, the Debtor further alleges that the Debtor then engaged in *bona fide* settlement negotiations with the Potential Defendants regarding the Subject Transfers and any defenses to avoidance and recovery the Potential Defendants intended to assert.  [*Id.* at 4].

In the 9019 Motion, the Debtor states that the Potential Defendants disputed whether the transfers at issue are avoidable based on, among other things, their defenses of exchanges of contemporaneous and subsequent new value.  Thereafter, "[a]fter multiple arms' length and good faith settlement negotiations, the Debtor reached an agreement with the Potential Defendants that will, if approved by this Court in connection with the instant Motion, not only result in a significant recovery for the Debtor's estate, but also reduce the overall claims pool and minimize the time, cost, and uncertainty associated with litigating the Subject Transfers."  [*Id.* at 5].

MarkWest objects to the proposed settlement. No other creditors or parties in interest oppose the 9019 Motion. Counsel for Bank7 and for the Potential Defendants appeared at the hearing on August 23 and argued in support of the proposed settlement.

The Settlement Agreement. The proposed settlement is memorialized in a "Settlement and Mutual Release Agreement" attached as Exhibit B to the 9019 Motion (the "Settlement Agreement"). [Ex. B, ECF No. 204]. The key terms of the Settlement Agreement provide that the Debtor will release the Potential Defendants from any and all claims and causes of action that the Debtor has, including claims under chapter 5 of the Bankruptcy Code, in exchange for the following: (1) a payment of $200,000; (2) the reduction to $500,000 of the $1,160,000 secured claim asserted by WCS, which will then be an allowed claim; and (3) reduction to $100,000 of the $720,000 unsecured claim asserted by WCS, which will then be an allowed claim. The Settlement Agreement also provides for mutual releases by and between the Debtor and the Potential Defendants of all claims and causes of action that each may assert against the other.

On June 14, 2023, the Debtor filed an application to employ MorrisAnderson & Associates, Ltd. ("MorrisAnderson") as financial advisor for the Debtor to assist with the Debtor's investigation and for analysis of the Debtor's transactional history and financial records in order to determine whether the Debtor possessed any avoidance claims it could pursue to maximize the value of the Debtor's bankruptcy

estate.  [ECF No. 139].  The Court entered an order approving the MorrisAnderson

employment on June 30, 2023.  [ECF No. 165]

MorrisAnderson worked with the Debtor's professionals to prepare and serve

WCS with a subpoena for an examination pursuant to Bankruptcy Rule 2004,

requesting documents necessary to conduct a comprehensive review of the Debtor's

financial records and prebankruptcy transactions.  Documents requested, produced,

and reviewed included the Debtor's tax returns from 2018 forward, its general

ledgers (including backup files in its QuickBooks accounting system), independent

CPA review reports for the period of 2018 through 2020, bank statements for

accounts utilized by the Debtor from the beginning of 2018 through the date of the

bankruptcy filing (including copies of checks and wire transfers), note payable

documents, internal financial statements for 2021, and the Debtor's bankruptcy

schedules and statements filed in this case.  MorrisAnderson examined material

transactions, advances and distributions in order to identify potential fraudulent

transfer claims, including those involving insiders and affiliated entities. [Tr. at 8-

10; D. Ex. 2, § 3].

Following the review and analysis of the Debtor's financial records, Mark

Welch ("Welch"), a principal of MorrisAnderson, prepared a comprehensive report

(the "MorrisAnderson Report" or "the Report").  [Tr. at 7; D. Ex. 2].  The Report

identified all relevant cash transactions that occurred in the five-year period before

the Debtor's bankruptcy filing, including any disbursements for the benefit of the

Potential Defendants.  [Tr. at 13]. Welch included in the MorrisAnderson Report all

the transactions that went out of the Debtor and presumed, for purposes of the report, that all such transactions benefitted WCS.  [Tr. at 12].

In addition to its analysis of the Debtor's financial transactions, MorrisAnderson, through Welch, conducted a solvency analysis.  [Tr. at 19].  The solvency analysis was complicated by the seasonal nature of the Debtor's business, making it difficult to establish definitively that the Debtor was insolvent at the time that potentially avoidable transfers took place.  Nevertheless, based on a careful analysis of the reasonably available financial records, and using his experience in the construction industry along with his experience in the preparation of numerous solvency analyses, Welch concluded that in 2018 the Debtor was solvent, in 2019 the Debtor was insolvent, in 2020 the Debtor was solvent, and subsequent to 2020 the Debtor was insolvent.  [Tr. at 22-34].  Based on his evaluation and analysis, including the assessment of the solvency of the Debtor at the time of any material transactions, Welch concluded that the Debtor had a potential claim against WCS totaling $800,000, as a result of transfers occurring during 2019.[7] [Tr. at 34-35].

---

[7] After the evidentiary portion of the hearing was concluded, MarkWest argued that while Welch "*would normally qualify*, he was never offered to the Court as an expert witness, never accepted by the Court as an expert witness, and therefore he can't testify as an expert witness . . . ." [Tr. at 195, emphasis added].  MarkWest acknowledged, however, that it did not object to Welch's testimony and that the failure of Welch to be admitted as an expert would bear only on the weight of his testimony. Despite the Debtor's apparent inadvertent failure to move Welch's admission as an expert witness, the Court affords great weight to Welch's testimony, analysis and report.  His qualifications and experience lend credibility to his testimony; however, more importantly, he established to the Court's satisfaction that to the extent his testimony included opinion testimony, it was not based on speculation or conjecture but rather on his personal knowledge of the subject matter after a comprehensive review of the Debtor's records, business practices, and detailed documentation.  *See In re Broad Assocs. Ltd. P'ship*, 110 B.R. 632, 637 (Bankr. D. Conn. 1990), *aff'd sub nom*, *Broad Assocs. Ltd. P'ship v. Pac. Mut. Life Ins. Co. (In re Broad Assocs. Ltd. P'Ship)*, Civ. No. B-90-170, 1990 WL 293699 (D. Conn. July 20, 1990) ("Estimates of projected cash

To avoid any conflicts of interest between the Debtor and the Potential Defendants, the Debtor appointed John Rose to serve as an independent manager of the Debtor. Rose oversaw the investigation of potential claims by the Debtor's professionals and worked with Debtor's counsel and MorrisAnderson to formulate demands and negotiate any settlement related to the Potential Defendants. Welch discussed the MorrisAnderson Report with Rose, who Welch acknowledged was inquisitive and engaged, asked questions, and worked to understand the Report. [Tr. at 36-37].

Rose testified that he authorized an initial demand of $1.125 million.[8] [Tr. at 68]. The original offer from the Potential Defendants was $25,000. [Tr. at 73]. Thereafter, the parties engaged in negotiations over a period of nine to ten days during which Rose had frequent conversations with Debtor's counsel and discussed every offer. [Tr. at 69]. "There was give and take on both sides." [Tr. at 75]. After extensive negotiations, and upon advice from the Debtor's professionals,[9] and

---

flow are technical in nature and ordinarily should be given by a qualified expert witness. . . . In the absence of an objection, a nonexpert may give such an opinion, but without a proper foundation which demonstrates that the witnesses' opinion is based upon personal knowledge, rather than upon unfounded speculation or conjecture, it is accorded little weight.").

[8] Rose testified that formulation of the initial demand included claims for excess compensation, [Tr. at 77], and that Debtor's counsel was unable to identify any potential breach of fiduciary duty claims. [Tr. at 67].

[9] Rose further testified that he "was overseeing the process and comfortable in the fact that [the professionals] were doing their jobs." [Tr. at 83]. The Court takes judicial notice that the first monthly fee application of Debtor's counsel, [ECF No. 194], includes 67.9 hours devoted to investigation of claims. Describing the steps he took before approving the Settlement Agreement, Rose testified that he "looked at the MorrisAnderson report. I also had discussions with counsel on their analysis. And there were oral discussions talking about potential other claims that I recall from the phone conversation, including breach of fiduciary as well as insider salaries." [Tr. at 97].

employing his own business judgment, Rose authorized the Debtor to enter into the Settlement Agreement. [Tr. at 71-72].[10]

In opposition to the proposed settlement, MarkWest offered the testimony of Thomas Jeremiassen ("Jeremiassen") of Diversified Specialists, Inc., who qualified as an expert in accounting and in offering financial advice to fiduciaries and debtors in insolvency situations. [Tr. at 116]. Jeremiassen testified that in his opinion, "the investigation and the analysis into the causes of action against the parties being released under the proposed settlement is superficial, inadequate, and incomplete."[11] [Tr. at 144]. Jeremiassen also questioned the methodology of MorrisAnderson's solvency analysis as well as the timing of the proposed settlement, opining that "if it's rushed . . . , one possible reason . . . is [t]he case might get converted to a Chapter 7 case, in which case the debtor-in-possession would lose control of those claims." [Tr. at 147-48].

---

[10] Rose testified that it was his understanding from counsel that the Debtor's limited amount of cash, "about two months left," influenced his decision to approve the Settlement Agreement. "And after all that, more time, more money, we have no guarantee as to the resolution . . .." [Tr. at 73, 87].

[11] In particular, Jeremiassen pointed to the lack of a comprehensive review of the Debtor's QuickBooks records. [Tr. at 121]. Welch offered the following explanation for his decision to rely primarily on other available financial records: "I took the QuickBook [sic] ledger and kind of broke that down. I looked at some of the transactions. I also did a comparison with the CPA reports that were included in the subpoena, looked at those, tried to reconcile the two. That also came to the conclusion that the third party or the CPA report … had better valid transactions and -- and balancing of the accounts. So therefore, I started with that as a starting point." [Tr. at 8]. Having concluded that the Debtor's QuickBooks ledger was unreliable, Welch testified that the third-party evidence, going back five years, was better "because the CPA firm which I did rely on did the balancing of the accounts, did the tax returns, did the balancing of the accounts, and made all the adjustments and everything. . . . I was concentrating on what's . . . material and what I think is the most valid third-party evidence." [Tr. at 39].

12

On cross examination, Jeremiassen admitted to having limited experience in the oil and gas industry, little experience in the construction industry and no experience with pipeline contractors.[12] [Tr. at 148-49]. He also acknowledged that he was not expressing an opinion on the Debtor's solvency or whether Welch's conclusions were incorrect. [Tr. at 150-51]. He was unable to identify any breach of fiduciary duty claims or any specific breach of contract claims. [Tr. at 150]. Nevertheless, he contended that additional work needed to be done in order to provide an appropriate analysis and estimated that doing so would take 50-100 hours at a cost of $40,000 to $80,000, "depending on the availability of information and records." [Tr. at 152-53]. Jeremiassen acknowledged that all the information needed may not be available and that obtaining the information and documents he would seek to review could take months. [Tr. at 153]. He did not dispute the Debtor's contention that it has insufficient funds to conduct a more extensive analysis or that it lacks the resources to remain in bankruptcy for an extended time. [Tr. at 154].

## Conclusions of Law

The Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference from the United States District Court for the Eastern District of Virginia, dated July 10, 1984. This is a

---

[12] By contrast, Welch has extensive experience in major construction companies and the oil and gas sector including "every kind of energy. That's primarily one of my focuses at MorrisAnderson." [Tr. at 17-18]. Welch described his solvency analysis as being "industry specific," requiring "a lot of balancing and understanding how . . . the business works. So you've got to filter that into your evaluation of solvency." [Tr. at 20-21].

core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

Bankruptcy Rule 9019 provides, in relevant part: "On motion by the [debtor in possession][13] and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, . . . and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct." The Court finds that proper notice of the proposed settlement has been given to creditors pursuant to Rule 2002.

At the outset, the Court recognizes that compromises are generally encouraged and favored in bankruptcy proceedings. *Arrowsmith v. Mallory (In re Health Diagnostic Lab'y, Inc*.), 588 B.R. 154, 169 (Bankr. E.D. Va. 2018) ("The settlement of time-consuming, burdensome, and uncertain litigation - especially in the bankruptcy context – is encouraged."); *In re Frye*, 216 B.R. 166, 172 (Bankr. E.D. Va. 1997) ("We recognize that settlement agreements between parties to lawsuits are designed to put an end to litigation and are favored by the law.").

A decision to approve a compromise or settlement under Bankruptcy Rule 9019 is subject to the Court's "sound discretion." *In re Health Diagnostic Lab'y,* 588 B.R. at 162. However, a settlement may not be approved if it falls "'below the lowest point in the range of reasonableness." *Id*. *See also* Shaia v. Three Rivers Wood, Inc. *(In re Three Rivers Woods, Inc.)*, Adv. Pro. No. 99-03020-DOT, 2001 WL 720620, at *6 (Bankr. E.D. Va. Mar. 20, 2001).

---

[13] A debtor in possession in a chapter 11 case has all the rights and powers of a bankruptcy trustee appointed in a chapter 11 case. 11 U.S.C. § 1107(a).

When deciding whether to approve a compromise, the Court looks at various factors to determine whether the compromise is in the best interest of the estate and whether it is fair and equitable to the creditors of the estate. *In re Frye,* 216 B.R. at 174. These factors include:

1. Probability of success in litigation;
2. The potential difficulties if any in collection;
3. The complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and
4. The paramount interest of the creditors.

*Id. See also In re Health Diagnostic Lab*'y, 588 B.R. at 162 (*citing In re Alpha Nat. Res. Inc.*, 544 B.R. 848, 857 (Bankr. E.D. Va. 2016).

In this case, MorrisAnderson concluded that the exposure of the Potential Defendants is confined to WCS, who is exposed to claims totaling $800,000 in avoidable transfers. The proposed settlement includes an initial lump sum payment to the bankruptcy estate of $200,000, a reduction of WCS's asserted secured claim of $1,160,000 to an allowed secured claim in the amount of $500,000 and a reduction of WCS's asserted unsecured claim of $720,000 to $100,000. The Debtor asserts that the proposed settlement "not only result[s] in a significant recovery for the Debtor's estate, but also reduce[s] the overall claims pool and minimize[s] the time, cost, and uncertainty associated with litigating the [transfers]." [ECF No. 204, at 9]. The Potential Defendants have asserted defenses to avoidance and recovery of the transfers at issue and provided information to the Debtor in support of those defenses.[14] The proposed settlement also resolves any challenge to WCS's claims

---

[14] Counsel for WCS has regularly appeared at hearings in this case and was present at the hearing conducted in connection with the 9019 Motion, at which time he represented that

that, if litigated, would add to the complexity of the litigation that would occur should the parties fail to settle.

Were the Debtor to move forward with litigation instead of accepting WCS's offer, success in pursuit of its claims is not guaranteed and, more importantly, may not yield an additional net recovery for the estate. The cash component of the proposed settlement combined with the substantial reduction in WCS's claims results in a value to the bankruptcy estate close to the Debtor's $800,000 estimate of its maximum potential recovery. At the least, litigation, even if successful, would subject the Debtor to significant cost and delay. The amount of the proposed settlement, which includes a substantial reduction in WCS's secured and unsecured claims, represents a net benefit to the bankruptcy estate that reflects a substantial probability of success in litigation while reducing the attendant time and expense. Thus, the probability of success in litigation is not a factor that weighs against approval of the proposed settlement.

The Debtor did not offer direct evidence of the potential difficulty in collection were litigation to ensue and the Debtor prevail. Therefore, one might conclude that the Debtor has not carried its burden of demonstrating that this factor supports approval of the proposed settlement. However, collectability presumes that the Debtor would prevail in litigation and becomes less of a factor when the offer being made approaches the potential maximum recovery. Here, the cash component of the proposed settlement coupled with the substantial reduction in WCS's claims

---

his clients intended to mount a vigorous, multi-faceted defense should litigation be brought against them by the Debtor. [Tr. at 78-79].

results in value to the bankruptcy estate approaching the Debtor's estimate of its maximum potential recovery from WCS. Therefore, collectability weighs less heavily when considering the proposed settlement.  In this case, collectability is, more or less, a non-factor.

The complexity of the litigation involved is evident from the testimony of Welch and Jeremiassen, the voluminous exhibits, and the extent of the litigation involved in simply seeking approval of the proposed settlement.  This factor favors approval of the proposed settlement.

The expense, inconvenience, and delay that would ensue should the Court reject the proposed settlement is perhaps the most significant factor supporting approval. Throughout this case, the Debtor has emphasized its goal of completing the bankruptcy proceedings expeditiously due to its limited resources.[15] Simultaneously, the Debtor has complained of MarkWest's "unrelenting" litigation tactics [9019 Motion, at 9], contending that MarkWest has forced the Debtor to expend a disproportionate amount of time, effort and professional fees responding to an onslaught of discovery requests, motions, and objections intended to undermine the Debtor's efforts to reorganize and perhaps to gain an advantage in the Colorado state court appellate proceedings.

---

[15] "The Debtor is a relatively small business and cannot afford to remain in chapter 11 for long.  Accordingly, it can borrow only a limited amount of money and must proceed expeditiously through its bankruptcy case to avoid the incurrence of unmanageable professional and administrative costs."  ICT-DIP LLC'S Reply in support of the DIP Financing Motion. [ECF No. 100, at 4].

The Court recognizes that MarkWest is the largest unsecured creditor in the case, with a legitimate purpose in seeking to maximize its recovery in bankruptcy. However, in this case, the Debtor's complaints over MarkWest's litigation tactics appear to be supported by the record. Throughout the pendency of this case, MarkWest has opposed numerous components of the Debtor's efforts to reorganize under chapter 11.[16] Opposing various motions is not unusual; however, MarkWest has also sought derivative standing on the theory that the Debtor would not pursue the claims that are the subject of the 9019 Motion[17] and has also sought the appointment of a Chapter 11 trustee.[18] Both the derivative standing motion and the chapter 11 trustee motion were withdrawn by MarkWest, but only after the Debtor incurred significant effort and expense in responding to the motions. At best, these motions may have been premature. Perhaps, as the Debtor contends, they were unsupported by facts and intended to harass the Debtor. Either way, one would certainly understand the Debtor's desire to proceed toward confirmation of a chapter 11 plan expeditiously in order to minimize the continuing expense,

---

[16] *See, e.g.*, MarkWest's objection to the DIP Financing Motion [ECF 60]; MarkWest's Reservations of rights as to the Debtor's application to retain Whiteford, Taylor & Preston as counsel [ECF No. 79]; MarkWest's opposition to the Debtor's motion to establish interim compensation for retained professionals [ECF No. 80]; MarkWest's objection to the Debtor's application to employ John Teitz as its chief restructuring officer [ECF No. 81]; MarkWest's "Rule 60 Motion for Relief from the Interim Order approving the DIP Financing" [ECF No. 88]; MarkWest's motion for derivative standing [ECF No. 89]; MarkWest's motion for the appointment of a chapter 11 trustee [ECF No. 121]; MarkWest's objection to the 9019 Motion [ECF No. 230].
[17] ECF No. 89.
[18] ECF No. 121

inconvenience, and delay associated with remaining in chapter 11.  The proposed

settlement is consistent with this objective and is a factor that favors approval.

When considering the paramount interest of creditors, the Court notes that

while MarkWest is the largest unsecured creditor, it is not the only creditor with a

substantial claim in the case.[19]  However, MarkWest was the sole creditor objecting

to the 9019 Motion.[20]  Given the nature of its claims, the Debtor would incur

substantial fees in proceeding with litigation against the Potential Defendants, with

the potential to obtain only a minimal recovery, resulting in creditors receiving a

lower distribution than they would receive under the proposed settlement.

Approval of the proposed settlement would alleviate the uncertainty, expense,

inconvenience, and delay attendant to a lengthy trial and subsequent collection

efforts.  Given the fact that administrative and taxing authority creditors have

priority over MarkWest, a creditor currently embroiled in appellate litigation that

could ultimately result in disallowance of its claim, the "paramount interest of the

general creditor body" factor also favors approval of the proposed settlement.

MarkWest's objection is largely based upon speculation, as it could point to

no claims that MorrisAnderson had failed to identify, and upon what it considers to

have been an insufficient investigation of the Debtor's potential claims against its

insiders. It contends that MorrisAnderson improperly relied on audited CPA reports

---

[19] *E.g.*, the Internal Revenue Service has filed a priority unsecured claim in the amount of
$93,463.54 (Claim No. 4-2); McGuireWoods LLP has filed an unsecured claim in the amount
of $800,734.21 (Claim No. 7-1).
[20] Bank7 appeared and urged the Court to approve the proposed settlement.  [Tr. at 182-
84].

and other financial data that did not include a complete analysis of the Debtor's QuickBooks ledgers.[21]  It also maintains the Debtor's independent director, Rose, failed to fulfill his duty to independently evaluate the Debtor's claims but instead relied exclusively on the Debtor's professionals' analysis and advice before accepting the proposed settlement.

The Court has considered the arguments of MarkWest and rejects the assertion that the analysis performed by MorrisAnderson and Debtor's other professionals was inadequate.  The decision of MorrisAnderson to concentrate its review on bank statements, tax returns, independent CPA reports, and financial information other than the QuickBooks ledgers (that it reasonably deemed to be unreliable) was reasonable and proportionate under the circumstances of this case.

The Court also rejects the contention that Rose failed to properly fulfill his role as independent director.  Rose did not make his decision arbitrarily or as a result of pressure from WCS or any other insider.  His role was not to perform the

---

[21] Jeremiassen testified that his opinion was based on his review of the following documents provided by the Debtor: financial statements for the years ending December 31, 2018-20; tax returns from 2018-21; AR aging detail report as of April 20, 2019; the QuickBooks report distribution detail dated January 1, 2023; the Debtor's statements and schedules; the Debtor's bank statements; the loan documentation between WCS and the Debtor; the deposition transcripts of Tietz and WCS; the notice of intent to pursue avoidance actions that the debtor sent to the counterparties; the lease agreements between WCS and the Debtor; the Debtor's profit and loss statements and balance sheets for the years 2021, 2022 and the first quarter of 2023; monthly fee statements of MorrisAnderson; the MorrisAnderson Report; and the 9019 Motion.  [Tr. at 117-121].  Yet, neither Jeremiassen nor MarkWest could identify any claims that had been overlooked by MorrisAnderson. Jeremiassen opined that his evaluation was hampered by his inability to review the complete QuickBooks general ledger, records that Welch deemed unreliable.  The Court finds that the business records provided to Jeremiassen, documents that were produced and also reviewed by the Debtor's professionals, are sufficiently comprehensive and proportionate to the needs of the case to be deemed adequate for purposes of the Debtor's analysis.

analysis himself, as that was the responsibility of the professionals retained for that purpose. Rose's responsibility was to oversee the process, review the results, consider the advice of his professionals and independently determine whether to make or accept an offer of settlement.  The record indicates that he fulfilled that duty.

The Court finds that the proposed settlement is fair and reasonable and in the best interest of the bankruptcy estate and its creditors. "[I]t does not fall below the lowest point in the range of reasonableness." *See In re Health Diagnostic Lab'y*, 588 B.R. at 162.  The Fourth Circuit Court of Appeals has held that under the business judgment rule, "courts should defer to—should not interfere with— decisions of corporate directors upon matters entrusted to their business judgment except upon a finding of bad faith or gross abuse of their business discretion.*" Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1047 (4th Cir. 1985) (superseded by statute on other grounds) (citation omitted).  MarkWest has proven neither bad faith nor a gross abuse of the Debtor's business discretion in this case.  Nor is the Debtor's decision to accept the settlement proposal "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice.*" Id.*  It is for these reasons that the Court has approved the 9019 Motion and overruled the objection of MarkWest.

A separate order has been issued.

               <u>/s/ Keith L. Phillips</u>
             United States Bankruptcy Judge

Signed:  October 6, 2023
Entered on Docket: October 6, 2023

Copies:

Brandy M. Rapp
Whiteford Taylor & Preston LLP
10 S. Jefferson Street
Suite 1110
Roanoke, VA 24011

Brandy M. Rapp
Whiteford Taylor & Preston LLP
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219

Michael J. Roeschenthaler
Ronald W. Crouch
Whiteford Taylor & Preston
11 Stanwix Street
Suite 1400
Pittsburgh, PA 15222

James K. Donaldson
Woods Rogers Vandeventer Black PLC
Riverfront Plaza - West Tower
901 East Byrd Street
Suite 1600
Richmond, VA 23219

Stephen L. Jerome
Molly J. Kjartanson
Snell & Wilmer LLP
One East Washington Street
Suite 2700
17 Phoenix, AZ 85004

William Gray
Sands Anderson
P.O. Box 1998
Richmond, VA 23219

Michael A. Shiner
Tucker Arensberg, P.C.
One PPG Place
15th Floor
Pittsburgh, PA 15222

Kathryn R. Montgomery
Office of the United States Trustee
701 East Broad Street, Ste. 4303
Richmond, VA 23219